**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **MATTHEW G. T.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 19 C 1486** |
| | ) | |
| **ANDREW M. SAUL,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Matthew G. T. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment seeking to affirm the decision. After careful review of the record and the parties' respective arguments, the Court now grants the Commissioner's motion.

## BACKGROUND

Plaintiff applied for DIB and SSI on June 18, 2013, alleging in both applications that he became disabled on October 1, 2009 due to extreme anxiety; agoraphobia; pain in his chest, arms and head during panic attacks; and obesity. (R. 191-92, 197-98, 225). Born in 1983, Plaintiff was 30 years old at the time of his applications and has at all times been a younger person. (R. 191, 197, 221); 20 C.F.R. § 404.1563(c); 20 C.F.R. §

416.963(c). He graduated from high school and lives with his fiancée in the basement of his fiancée's mother's house. (R. 12, 226, 736, 746). Plaintiff worked as a waiter/bartender from 1999 until October 1, 2009, when he quit because he started experiencing panic attacks and could no longer handle the fast pace and continuous interactions with people. (R. 14, 34, 225-26).

The Social Security Administration denied Plaintiff's applications at all levels of review, and he appealed to the district court. Magistrate Judge Jeffrey Cole, presiding by consent, conducted an initial review of the case before briefing and in a short order identified some "apparent" problems with the decision reached by administrative law judge Daniel Dadabo (the "ALJ"). (Case No. 17 C 5665, Memorandum Opinion and Order of 10/10/2017, Doc. 15, at 2). Specifically, Judge Cole noted that the ALJ did not properly address Plaintiff's obesity and appeared to have erred in evaluating Plaintiff's limitations in concentration, persistence, or pace. (*Id.* at 2-4). On October 25, 2017, the parties agreed to remand the case for further consideration of the stated issues. On March 2, 2018, the Appeals Council vacated the final decision of the Commissioner and remanded the case to the ALJ "for further administrative proceedings in accordance with the fourth sentence of section 205(g) of the Social Security Act." (R. 816). The ALJ was instructed to: give further consideration to Plaintiff's maximum residual functional capacity; further evaluate Plaintiff's alleged symptoms; and, if warranted, obtain supplemental evidence from a vocational expert. (R. 817).

While the case was on appeal, Plaintiff completed a new Function Report around September 19, 2017 stating that he was incapable of working due to his daily panic attacks, depression, and agoraphobia. (R. 903-11). Just a week later, on September 28,

2

2017, Plaintiff started a job working nights cleaning a PetSmart store.  He was still employed the following year when the ALJ held a new hearing on August 15, 2018.  As a result, Plaintiff amended his request for review to a closed period from October 1, 2009 to September 28, 2017.[1]  (R. 708).  The ALJ heard testimony from both Plaintiff, who was represented by counsel, and vocational expert Tobey Andre (the "VE").  (R. 732-86).  On November 20, 2018, the ALJ found that during the closed period, Plaintiff's anxiety with agoraphobia and depression were severe impairments, but they did not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 711-13). After reviewing the evidence, the ALJ concluded that Plaintiff was not disabled at any time from October 1, 2009 through September 28, 2017 because he retained the residual functional capacity ("RFC") to perform a significant number of jobs available in the national economy, including industrial cleaner.  (R. 713-21).  The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. §§ 405(g) and 1383(c)(3).  *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005); *Whitney v. Astrue*, 889 F. Supp. 2d 1086, 1088 (N.D. Ill. 2012).

In support of his request for reversal or remand, Plaintiff raises a host of arguments, including that the ALJ: (1) made a flawed RFC determination that did not properly weigh the medical opinions of record or fairly consider Plaintiff's subjective statements regarding the limiting effects of his symptoms; (2) failed to account for Plaintiff's moderate difficulties with concentration, persistence, or pace; (3) improperly ignored the fluctuating nature of Plaintiff's symptoms; and (4) accepted unreliable VE

---

[1]     Plaintiff suggested a disability end date of August 31, 2017, the date he was hired at PetSmart, (R. 734), but the ALJ utilized the date he actually started working.  (R. 708).

testimony regarding the number of jobs available to a person with Plaintiff's background and RFC. For the reasons discussed below, this Court finds that the ALJ's decision is supported by substantial evidence.

## DISCUSSION

### A. Standard of Review

Judicial review of the Commissioner's final decision is authorized by the Social Security Act. 42 U.S.C. §§ 405(g), 1383(c)(3). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). *See also L.D.R. by Wagner v. Berryhill*, 920 F.3d 1146, 1151-52 (7th Cir. 2019). The Court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

In making its determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to her conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and

quotation marks omitted)).  When the ALJ's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.     Five-Step Inquiry

To recover DIB or SSI, a claimant must establish that he is disabled within the meaning of the Social Security Act.[2]  *Shewmake v. Colvin*, No. 15 C 6734, 2016 WL 6948380, at *1 (N.D. Ill. Nov. 28, 2016).  A claimant is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a).  In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether he can perform his past relevant work; and (5) whether the claimant is capable of performing any work in the national economy."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).  If the claimant meets his burden of proof at steps one through four, the burden shifts to the Commissioner at step five.  *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

---

[2]      Because the regulations governing DIB and SSI are substantially identical, for ease of reference, only the DIB regulations are cited herein.

## C.    Analysis

### 1.    RFC

Plaintiff first argues that the ALJ erred in determining his RFC.  A claimant's RFC is the maximum work that he can perform despite any limitations.  *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, at *1-2.  "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he has reached his conclusions."  *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).  The ALJ found that from the October 1, 2009 alleged disability onset date to September 28, 2017, Plaintiff had moderate limitations in the ability to interact with others; to sustain concentration, persistence, or pace; and to adapt and manage himself.  (R. 712-13).  Nevertheless, Plaintiff retained the RFC to work five days a week, eight hours a day at a consistent pace with only normal breaks, and with the following additional restrictions:  he could understand, remember and apply simple information; he could adjust to routine changes in process and priority but needed rote work that varied little from day to day; he required end of day performance expectations rather than hourly performance expectations; and he needed to avoid public contact, team coordination, or more than occasional interaction with co-workers and supervisors.  (R. 713).

Plaintiff objects that the ALJ failed to explain the basis for this RFC.  (Doc. 16, at 5).  Though the ALJ did not expressly say so, it is readily apparent that the RFC is based on the VE's description of the vocational requirements attributable to Plaintiff's job as a night cleaner at PetSmart, which he started performing successfully on September 28, 2017.  *Compare Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010) (remand

necessary where the record did not contain any support for the parameters included in the RFC determination). That is, he has only occasional interaction with coworkers and supervisors; no team coordination; no interaction with the public; the ability to take instructions from a supervisor; flexible, end-of-shift performance expectations; only routine changes in process and priority; and rote work with limited daily variability. (R. 768-71). The question is whether the ALJ erred in concluding that Plaintiff had the RFC to perform the mental requirements of the night cleaner job from October 1, 2009 to September 28, 2017.

As discussed below, this case is unusual because there is no apparent change in Plaintiff's mental condition to explain his sudden ability to work full-time as of September 28, 2017. While Plaintiff's treaters indicated that he was severely limited in his functional ability, his mental exams were routinely normal. In February 2017, Plaintiff's treater was recommending in-home counseling because Plaintiff's symptoms were so severe that he purportedly was no longer able to leave the house for therapy. Plaintiff echoed this sentiment in a Function Report he completed around September 19, 2017. Yet despite not receiving any in-home therapy, Plaintiff was able to regularly attend appointments to address his physical ailments throughout 2017. On September 28, 2017, moreover, Plaintiff started working at PetSmart and was such a good employee that he was quickly promoted. The ALJ reasonably considered these and other inconsistencies in the record in affording little weight to the opinions from Plaintiff's treaters and discounting Plaintiff's statements regarding his functional limitations. The RFC is thus supported by substantial evidence.

### a. Medical Opinions

Plaintiff argues that the RFC cannot stand because the ALJ did not properly assess the opinion evidence of record. The medical opinions present two extreme views of Plaintiff's functioning during the relevant period. The State agency reviewers (Lionel Hudspeth, Psy.D. and Alvin Smith, Ph.D.) determined in September 2013 and April 2014 that Plaintiff did not have a severe mental impairment at all so did not impose any related restrictions. (R. 83, 92, 104, 114, 810-11). On the other hand, Plaintiff's psychiatric nurse, Michelle Heyland, APN, opined in a Mental Impairment Questionnaire dated October 5, 2015 that Plaintiff had a variety of severe limitations as a result of his impairments, including moderate restrictions of activities of daily living; extreme difficulties maintaining social functioning; frequent deficiencies of concentration, persistence, or pace; and repeated (3 or more) episodes of deterioration or decompensation in work-like settings. (R. 600). Nurse Heyland checked a series of boxes indicating that Plaintiff would be absent from work more than 3 times per month (R. 599), and though he exhibited good ability to remember work-like procedures, understand and remember very short and simple instructions, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions, in many other areas he was deficient. (R. 599). Specifically, Plaintiff had only a fair ability to carry out short and simple instructions; maintain regular attendance and be punctual within customary, usually strict, tolerances; make simple work-related decisions; and respond appropriately to changes in a routine work setting. (*Id.*). And he had poor to no ability to maintain attention for 2-hour segments; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; complete a normal workday

8

and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; and deal with normal work stress. (*Id.*).

Nurse Heyland also coauthored a letter with Plaintiff's therapist, Gideon Litherland, MA, LPC, QMHP, on September 29, 2015. Nurse Heyland and Mr. Litherland stated that Plaintiff struggled with persistent symptoms of agoraphobia, including: fear of being outside the house and in crowds; active avoidance of overly stimulating environments; and disproportionate responses to minimal threats. (R. 597). They noted Plaintiff's history of "untreated dysthymia . . . with persistent major depressive episode," causing a depressed mood, poor sleep, low self-efficacy, low esteem, and intense feelings of hopelessness for the previous 3 years. (*Id.*). Mr. Litherland and Nurse Heyland opined that these symptoms impacted Plaintiff's ability to maintain employment, keep stable and self-supported housing, and engage in pleasurable activities. (*Id.*). A year later, on September 27, 2016, Mr. Litherland wrote a second letter that was largely identical to the one he coauthored with Nurse Heyland, except that it added a sentence about Plaintiff missing appointments due to his symptoms, and recommended in-home counseling. (R. 1025). The ALJ assigned a specific weight to the 2015 letter but did not assign a separate weight to the 2016 letter. The ALJ did, however, address Plaintiff's difficulty attending appointments, and acknowledged the suggestion that Plaintiff try in-home therapy. (R. 720). Given that the two letters were nearly identical, and the ALJ addressed new information in the second letter, the ALJ's failure to assign a specific weight to the 2016

letter does not constitute reversible error. *See Apke v. Saul*, 817 F. App'x 252, 256-57 (7th Cir. 2020) (affirming where the ALJ considered all opinions in the record).

The ALJ did not accept either view of Plaintiff's abilities, giving only limited weight to the opinions on both sides. In rejecting the opinions of the State agency reviewers, the ALJ concluded that Plaintiff's anxiety with agoraphobia and depression were severe impairments that would cause "more than minimal restriction on his ability to function at work." (R. 711-12, 720). Neither party challenges this conclusion. As for Nurse Heyland and Mr. Litherland, the ALJ first discounted their opinions because they are not "acceptable medical sources." (R. 719). *See Jessica K. v. Saul*, No. 19 C 4380, 2020 WL 4015330, at *11 (N.D. Ill. July 16, 2020) (citing 20 C.F.R. § 404.1502(a)) ("Acceptable medical sources are limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists."). The Court finds no error in this determination. *Id.* at *13 (citing *Shaun R. v. Saul*, No. 18 C 4036, 2019 WL 6834664, at *7 (N.D. Ill. Dec. 16, 2019)) ("The fact that an opinion 'did not come from an acceptable medical source' is an 'entirely valid' reason for discounting it."). Nevertheless, the ALJ was required to evaluate the opinions "based on the same kinds of factors that are used to evaluate acceptable medical sources, such as the length of the treatment relationship and frequency of examination; the consistency of the opinion with other evidence; whether the treater is a specialist; and the quality of support of the opinion." *Id.* at *12 (citing SSR 06-3p, 20 CFR § 404.1527(c)(2)-(6)).

The ALJ gave the opinions from Nurse Heyland and Mr. Litherland little weight because he found them inconsistent with treatment notes showing that Plaintiff was able to "go to weddings, attend fairs, and cook for his family," and with evidence that Plaintiff

was taking care of elderly relatives outside the home. (R. 719). Plaintiff argues that this was error because the record contains numerous abnormal treatment notes that support the opinions from Nurse Heyland and Mr. Litherland that he was significantly limited in the ability to interact with others, could not sustain a "workplace pace," and would be absent from work 3 days per month.[3] (Doc. 16, at 8-10). The Commissioner insists that Plaintiff's argument ignores the fact that most of his mental status exams were normal, and that many of the treatment records show he was doing well and able to engage in activities outside the home. (Doc. 25, at 10-11).

There is no evidence that Plaintiff received any mental health treatment from October 1, 2009 until March 2011, reportedly due to a lack of insurance. (R. 352). Thus, the first available record is dated March 14, 2011 when Plaintiff sought treatment from Metrodocs for trouble sleeping at night and ear pain. (R. 352).[4] Over the course of 8 appointments from April through October 2011, Plaintiff complained of daily panic attacks, anxiety, and sleep disturbance, with associated chest pain and shortness of breath. According to the treatment notes, his "occupation" was "taking care of grandmother." (R. 334). Plaintiff was put on medications, and as of October 6, 2011, he was feeling better, exercising, and walking the dog. (R. 334, 336, 338, 340, 342, 345, 347, 349, 715). In the

---

[3]     Plaintiff does not specifically address any of the other limitations set forth by Nurse Heyland and Mr. Litherland, such as carrying out short and simple instructions, making simple work-related decisions, and dealing with normal work stress. He has therefore waived any related arguments. *Crespo v. Colvin*, 824 F.3d 667, 673 (7th Cir. 2016) ("Perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

[4]     Under "Reason for Appointment," the first visit record states: "TROUBLE SLEEPING AT NIGHT/EAR PAIN; last year Jan 2010 pt [patient] went to ER due to chest pain; had x-ray, EKG and blood test and all were normal; was told he was stressed out and was prescribed anxiety meds?; pt still c/o [complains of] chest pain on and off, headache. Pt did not go back to MD had no insurance; states unable to sleep well; wakes up in middle of night; also discomfort in left ear; c/o some anxiety." (R. 352).

meantime, on September 20, 2011, Plaintiff started seeing Shah Nawaz, M.D., who likewise indicated that Plaintiff reported working "part-time taking care of his fiancée's grandmother." (R. 366, 715). On exam, Plaintiff was anxious but alert, cooperative, and coherent with no other concerns noted. (R. 367, 715). Dr. Nawaz prescribed Klonopin, Paxil, and trazodone, and Plaintiff told him he was feeling calmer in November 2011. (R. 369). Plaintiff continued to report panic attacks in January 2012 (R. 331), but he did not receive additional treatment again until March 2014. As noted, in June 2013, Plaintiff applied for DIB and SSI.

On March 24, 2014, Plaintiff went to Genesis Primary Care for an annual exam and help with his anxiety. (R. 390, 715). Plaintiff told Diana Smith, M.D., that this appointment was only his second time out of the house in 3 years. (R. 390). Dr. Smith diagnosed anxiety and prescribed sertraline, clonazepam, and zolpidem. (R. 385, 390). The panic attacks continued in May, and on July 16, 2014, Plaintiff told Dr. Smith that he was "somewhat better now" but still having panic attacks 5 times per day instead of 20-30 times per day. (R. 518, 533). Also on July 16, 2014, Plaintiff began regular therapy sessions with Mr. Litherland at Turning Point Behavioral Health Care Center ("Turning Point"). (R. 453, 715). He endorsed symptoms of anxiety/panic and agoraphobic tendencies. (R. 448). Just two weeks later, however, on July 30, 2014, Plaintiff told Mr. Litherland that the past month "has been really great." (R. 453). He reported feeling very down again on August 6, 2014, explaining that he had "blacked out from drinking" and had experienced two panic attacks that morning. (R. 454, 716).

Plaintiff started seeing Nurse Heyland on August 19, 2014 for medication management. He said he had "a positive outlook" on life but was seeking to "get the last

little bit under control." (R. 422, 716). On exam Plaintiff was dressed and groomed appropriately, calm, and cooperative. His affect was stable, full, and appropriate, his mood was euthymic, and he exhibited a coherent, logical, and goal-directed thought process. (R. 424-25, 716). Plaintiff continued to treat with both Mr. Litherland and Nurse Heyland from August 25, 2014 through September 15, 2015. He reported doing well in late August and September 2014, with improved sleep and a "successful weekend" where he "was able to go to the Renaissance fair and Six Flags." (R. 459-60, 716-17). When Nurse Heyland saw Plaintiff on September 8, 2014, he complained of increased depression and poor sleep, but his mental exam was once again normal aside from a dysphoric mood. (R. 445, 716). He then suffered a brief period of increased depression, poor sleep, negative self-talk, and a desire to "end it all." (R. 443, 461, 463, 464). He also cut himself on one occasion. (R. 443, 463, 716-17).

On September 29, 2014, Plaintiff reported having a couple of panic attacks but said he was feeling better during the day. He was also less depressed and spending more time outside. (R. 441, 716). Nurse Heyland documented: intact judgment and insight; intact associations; a coherent, goal-directed, and logical thought process; and fluent, spontaneous speech of normal rate, rhythm, and volume. (R. 441). Plaintiff was once again dressed and groomed appropriately, his mood was euthymic, and his affect was full, stable, and appropriate. (*Id.*). By October 1, 2014, Plaintiff told Mr. Litherland that he felt "really good. I feel so happy." The change in mood was attributed to a recent switch to a new medication, Effexor. (R. 467, 468, 717). Plaintiff had started connecting with old friends and said that even though the panic attacks had returned, they were "bearable with help." (R. 469). At the next session on October 6, 2014, Plaintiff reported

13

going to the Chicago Botanical Gardens, going to the grocery store, and making food for the family. (R. 468, 717).

The picture changed again for a short period in late October 2014, with increased irritability, tearfulness, and rage, as well as more panic attacks. (R. 439, 716). An October 27, 2014 exam with Nurse Heyland, however, was largely normal despite a dysphoric mood and tearfulness at the beginning of the appointment. (R. 439). Plaintiff reported feeling less depressed in November but presented with anhedonia, a low mood, and feelings of rage and anger. (R. 472, 474, 475, 716). He acknowledged that he was not taking his Valium every day, and Nurse Heyland noted that it was difficult to assess the efficacy of his medications because he was smoking marijuana. (R. 437, 716). Despite this, a mental exam was normal except for a dysphoric mood. (R. 437). On November 24, 2014, Plaintiff was "much better" and "feeling good," this time because he had stopped Effexor. His anxiety was well controlled with Valium and his mental exam was normal including a euthymic mood. (R. 435, 476, 716). He remained in "a really good mood" and feeling "great" through mid-December, even spending an evening at a friend's house "jamming and having fun." (R. 479, 480, 716, 717).

Though Plaintiff struggled around the holidays, he was once again in a good mood and high spirits on January 20, 2015. (R. 481-84). He regressed in late January through March 2015, with low mood, poor self-efficacy, feelings of regret, panic attacks, feelings of sadness, increased anxiety and depression, and poor sleep, which he attributed to the weather. (R. 433, 483-86, 488-90, 716). On March 23, 2015 in particular, he reported not leaving the house for 3 weeks, he had not showered in 2 weeks, and he was unable to go outside. (R. 490, 717).

14

Plaintiff improved again in April 2015, telling Mr. Litherland on April 13 that he was feeling "much better" and was spending time working in the garden. (R. 492, 717). On April 20, 2015, Plaintiff reported that he was still feeling good and was able to be in a grocery store for 20 minutes the prior evening before needing to leave. (R. 493, 717). Nurse Heyland documented a normal mental exam, except for a dysphoric and anxious mood. (R. 431). The following week, Plaintiff was not sleeping well and described thoughts of hopelessness and sadness. (R. 495). In May 2015, Plaintiff attended a weekend wedding in Wisconsin but reported having 3 panic attacks and feeling "miserable." (R. 498, 716). When he saw Nurse Heyland on June 1, 2015, Plaintiff said he only had a single panic attack during the wedding. He also complained that there were too many people in the waiting room that day, and said he had not been taking his Valium. (R. 429). At an appointment on July 6, 2015, Plaintiff told Mr. Litherland that he was exercising and cooking more for his partner and her family despite continued amotivation and anhedonia. (R. 504). Though Plaintiff's anxiety remained high on July 13, 2015, his mental exam with Nurse Heyland was largely normal despite a flat affect and anxious mood. (R. 427, 716). On August 3, 2015, Plaintiff told Mr. Litherland that he had attended a concert but it got too loud. (R. 507). Plaintiff explained at the October 22, 2015 administrative hearing that he had gone to Alpine Valley Music Theatre and stayed for 25 minutes. (R. 38).

On August 18, 2015, Mr. Litherland completed a Comprehensive Mental Health Assessment of Plaintiff. (R. 404-13, 716).[5] Mr. Litherland indicated that Plaintiff struggled with severe agoraphobia but demonstrated little difficulty in developing a connection with

---

[5]     The ALJ mistakenly stated that this assessment took place on July 16, 2014. (R. 716).

peers.  In that regard, Plaintiff reported doing "lots of things" with his girlfriend's brother, including biking, gardening, and playing basketball.  (R. 408, 716).  He was sad and anxious with limited insight into his illness/life situations, but he was also cooperative, he exhibited logical thought process and content, and he presented with normal speech and perception.  (R. 409-10, 716).  Mr. Litherland noted that Plaintiff's employment history included bartending and "caretaking for partner's grandparents (maternal and paternal)." (R. 408).  Mr. Litherland diagnosed agoraphobia and depressive disorder.  (R. 413).

Plaintiff complained of a low mood into September 2015, with amotivation, impoverished affect, feelings of depression, and negative thoughts.  (R. 510-11, 716). After September 15, 2015, Plaintiff largely stopped receiving mental health treatment from Mr. Litherland and Nurse Heyland.  In a letter dated a year later on September 27, 2016, Mr. Litherland reported that due to the severity of Plaintiff's symptoms, he had attended only 4 out of 8 counseling sessions, and 1 out of 3 psychiatric appointments since April 2016.  (R. 1025).[6]  Mr. Litherland recommended that Plaintiff receive in-home counseling to accommodate his problems.  (*Id.*).  There is no evidence that Plaintiff pursued in-home therapy but he did have an evaluation at Turning Point in November 2016.  Psychiatrist Robert Channon, M.D. observed that Plaintiff's mental status exam was essentially normal except he exhibited some tremors, a constricted affect, an anxious mood, and impaired judgment.  (R. 1109-11).

On February 9, 2017, Plaintiff presented to Turning Point complaining, "I don't leave the house."  His only activities were watching television and playing with his dog. (R. 970, 717).  On exam, Plaintiff appeared disheveled with poor hygiene.  He was also

---

[6]     The record does not contain any therapy notes from Mr. Litherland or Nurse Heyland after September 15, 2015.

calm and cooperative with a blunted but appropriate affect, a depressed and anxious mood, and impaired insight and judgment. (R. 973-75, 717). The examining psychiatrist recommended that Plaintiff follow up in 8 weeks. (R. 976). Less than two weeks later, on February 22, 2017, Plaintiff was discharged from Turning Point due to noncompliance with treatment. Mr. Litherland again indicated that Plaintiff "require[d] in-home counseling and home visitation" to treat his agoraphobia. (R. 717, 981, 984).

Plaintiff never pursued in-home treatment but on March 20, 2017, he attended a psychological assessment on referral from his primary care physician at Genesis Primary Care. He reported that he was unable to leave the house due to panic attacks and could only attend appointments on "a good day." (R. 717, 990). He had stopped taking his antidepressants a month prior but agreed to restart them. (*Id.*). On exam, Plaintiff was poorly groomed, had limited eye contact, was really depressed, and exhibited a constricted affect. Plaintiff said that being around people and crowds was triggering, causing: palpitations; shortness of breath; racing thoughts; panic attacks; anhedonia; lack of motivation; lack of drive; self isolation; crying spells; hopelessness/helplessness; irritability; excessive worry; and feelings of impending doom. (R. 717, 991). The social worker assessed panic disorder with agoraphobia, and major depressive disorder, severe, recurrent. She instructed Plaintiff to resume his antidepressants and indicated she would try to locate in-home therapy services for him. (R. 993). Plaintiff received an ambulatory referral to the psychiatry department at Genesis Primary Care on August 1, 2017, but it does not appear that he went for that additional therapy. (R. 717, 1145). As discussed in more detail later, Plaintiff started working at PetSmart the following month

and proved to be such a good employee that he was quickly promoted. He was still working there on a full-time basis as of the August 15, 2018 hearing before the ALJ.

The ALJ provided a thorough and detailed recitation of these records and reasonably concluded that they do not support the severe restrictions imposed by Nurse Heyland and Mr. Litherland. First, the restrictions are inconsistent with Nurse Heyland's own treatment notes showing essentially normal mental exams. (R. 716, 719). Over the course of 10 appointments between September 8, 2014 and July 13, 2015, Plaintiff was usually cooperative and dressed/groomed appropriately; his speech was spontaneous, normal, and fluent; he exhibited coherent and logical thought process, intact associations, intact judgment and insight, and average concentration and attention; and his affect was full, stable, and appropriate. (R. 427, 429, 431, 433, 435, 437, 439, 441, 443, 445).

The ALJ also noted that the severe limitations contemplated by Nurse Heyland and Mr. Litherland are inconsistent with evidence that Plaintiff was able to: travel outside the home to care for grandparents; cook for his family; and engage in a variety of activities including biking, gardening, carpentry, and playing basketball. (R. 716, 719). Plaintiff considered caring for grandparents such a significant activity that he repeatedly characterized it to multiple treaters as an "occupation," "part-time" work, and "employment." (R. 28-29, 365-67, 331, 334, 336, 338, 340, 342, 345, 347, 366, 408, 711, 719). And though Nurse Heyland opined that Plaintiff would have poor to no ability to get along with coworkers or peers, Mr. Litherland found in August 2015 that Plaintiff demonstrated "little difficulty in developing a connection with peers" and was able to do "lots of things" with his girlfriend's brother (biking, gardening, and playing basketball). As the ALJ observed, some of those activities required "sustained concentration" despite

Nurse Heyland's view that Plaintiff had no ability to focus.  (R. 408, 712-13, 716).  *See Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (an ALJ may discount even a treating physician's opinion that is internally inconsistent); *Jacoby v. Barnhart*, 93 F. App'x 939, 942 (7th Cir. 2004) (ALJ properly discounted treating physician opinion that was inconsistent with his treatment notes).

Moreover, the opinions from Nurse Heyland and Mr. Litherland are inconsistent with Plaintiff's ability to work as a night cleaner at PetSmart as of September 28, 2017. In that job, Plaintiff is able to interact with a supervisor, maintain regular attendance, concentrate adequately, and deal with normal work stress, all things Nurse Heyland and Mr. Litherland indicated Plaintiff could not do.  The record contains no evidence of any change in Plaintiff's medical condition that would explain why he was unable to work before September 28, 2017, but was able to do so successfully after that date.  (R. 712, 720).  As late as February 2017, Mr. Litherland indicated that Plaintiff needed in-home therapy because his agoraphobia was too intense for him to keep regular appointments. Yet Plaintiff was able to attend regular appointments for his physical ailments (e.g., STDs) from January through at least September 2017.  (R. 717, 718, 720, 987-88, 1000-18, 1074-1106).  And by September 28, 2017, he was able to work without problem despite never having received in-home or other psychiatric services.  (R. 720).  As for concerns from Nurse Heyland and Mr. Litherland about Plaintiff's poor prognosis, the ALJ reasonably concluded these were "beside the point because he worked despite not receiving [the recommended in-home] services."  (*Id.*).

19

Viewing the record as a whole, the ALJ did not commit reversible error in affording little weight to the opinions from Nurse Heyland and Mr. Litherland when considering Plaintiff's RFC.

### b.    Plaintiff's Testimony

Plaintiff argues that the RFC is still flawed because it fails to account for his own testimony regarding his limitations.  (Doc. 16, at 6).  The regulations describe a two-step process for evaluating a claimant's own description of his impairments. First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain."  SSR 16-3p, at *2.  If there is such an impairment, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  *Id.*  In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, . . . and justify the finding with specific reasons."  *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Plaintiff testified that he rarely left his house and could only sustain extremely brief interactions when he did so.  (R. 13-37, 762-63).  He canceled appointments, could not be around large groups of people, and could not focus for more than an hour or two before needing a break.  (R. 23, 762-63).  Plaintiff claims this testimony "strongly suggests that [he] would be absent from any job several days per week at a minimum due to his mental impairments and that when he was able to attend work, would be unable to sustain an acceptable pace."  (Doc. 16, at 6-7).

In discounting Plaintiff's statements, the ALJ identified several inconsistencies that undermined his reports of disabling symptoms. In a July 10, 2013 Function Report, for example, Plaintiff stated he had not "left the house in a few years without being overcome with panic." (R. 240, 714). Plaintiff made a similar claim in a March 17, 2014 Function Report, asserting that he had only left the home twice in the previous three years. (R. 264, 714). At the August 2018 hearing, however, Plaintiff acknowledged that he left the house to care for grandparents during that period. (R. 714, 750-51). The ALJ fairly observed that this activity suggested Plaintiff had greater "adaptive reserves" than he claimed. (R. 711). In addition, Plaintiff's testimony at the October 22, 2015 hearing that he rarely left the basement is contradicted by evidence that he regularly attended therapy sessions; went to a Renaissance fair, Six Flags, and the Chicago Botanical Gardens; went to the grocery store; spent a night at a friend's house "jamming and having fun"; attended a weekend wedding in Wisconsin; and went biking, played basketball, and gardened. (R. 13-14, 718-19).

Similarly, Plaintiff's assertion at the August 15, 2018 hearing that he stopped attending therapy sessions at Turning Point in 2017 because his agoraphobia was too intense and he was not able to leave the house conflicts with evidence that he continued receiving nearly monthly care for his physical ailments from January through at least September 2017. (R. 717, 718, 720, 745, 987-88, 1000-18, 1074-1106). Contrary to Plaintiff's suggestion, these are not minor inconsistencies. Compare *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) (inconsistencies concerning "trivial matters" such as the plaintiff's stated ability to pay bills despite having difficulties handling money did not justify discounting the plaintiff's testimony). The ALJ also noted that Plaintiff gave

inconsistent statements to his providers about his marijuana and alcohol use, which cast doubt on his ability to "provide accurate and specific detail" about his symptomatology. (R. 718).

As for Plaintiff's ability to start working in September 2017 despite a lack of any change in his medical condition, Plaintiff argues that the ALJ should have accepted his own explanation for how he improved: he started walking his dog at night and tried to interact with others and leave the house more regularly. (Doc. 16, at 10). At the August 15, 2018 hearing, Plaintiff said that when he got the dog in early 2015, his fiancée had to take her for walks because he could not go outside. (R. 739-40). According to Plaintiff, sometime around February 2016 he started taking the dog for walks at night, then progressed to walking her during the day and talking to neighbors. (R. 740-42, 756-59). The ALJ found this testimony unconvincing, citing a March 2017 record from Genesis Primary Care where Plaintiff told a social worker that he "is unable to leave his home due to panic." (R. 720) (citing R. 990). *See also* R. 914 (2017 statement from Plaintiff that he is "treatment resistant" and needs in-home therapy). Plaintiff also stated in a September 19, 2017 Function Report that he merely let the dog out and fed her, and his fiancée walked the dog. (R. 904).

Plaintiff claims that he did not improve simply by walking the dog. Rather, "toward the end of the eight-year closed period, [he] testified that he attended a concert for 15-20 minutes before needing to leave and attempted to complete shopping trips without needing to go to sit in his car due to anxiety." (Doc. 31, at 3). But Plaintiff attended the concert in July or August 2015, more than two years before the September 28, 2017 alleged disability end date. (R. 507). And he testified at the August 2018 hearing that

even now that he is working successfully, he still gets overwhelmed in the grocery store and has to sit in the car sometimes.  (R. 762).

Plaintiff finally argues that the ALJ's decision is internally inconsistent because he found no evidence to explain how Plaintiff improved in 2017, but also stated that Plaintiff "appear[ed] to have progressed overall and improved with therapy and appropriate medication."  (R. 717).  Even if the ALJ's observation on this point was flawed, it does not require reversal given the numerous inconsistencies in Plaintiff's statements regarding the limiting effects of his agoraphobia.  *Dawson v. Colvin*, No. 11 C 6671, 2014 WL 1392974, at *10 (N.D. Ill. Apr. 10, 2014) (citing *Schreiber v. Colvin*, 519 F. App'x 951, 961 (7th Cir. 2013)) ("The ALJ's credibility assessment need not be perfect; it just can't be patently wrong.").  "As the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'"  *Richard C. v. Saul*, No. 19 C 50013, 2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek*, 139 S. Ct. at 1154).[7]

### c.    Summary

In sum, the ALJ's RFC determination, including his decisions to discount the opinions from Nurse Heyland and Mr. Litherland and the testimony from Plaintiff, is supported by substantial evidence.  Plaintiff's request to reverse or remand the case for further consideration of these issues is denied.

---

[7]    When asked what led him to apply for work, Plaintiff said he found out he and his fiancée were in great debt.  (R. 736).  Plaintiff said he got the job at PetSmart by applying online and then going in for an interview.  (R. 753).

2.      **Concentration, Persistence, or Pace**

Plaintiff next argues that the ALJ failed to adequately address his difficulties with concentration, persistence, or pace ("CPP").  The ALJ found that from October 1, 2009 to September 28, 2017, Plaintiff had moderate difficulties in this area, and limited him to: rote work that varied little day to day and involved routine changes in process and priority; understanding, remembering, and applying only simple information; and end of day performance expectations, rather than hourly expectations.  (R. 713).  Plaintiff objects that these restrictions are inadequate, noting that the Seventh Circuit has cautioned ALJs that limitations to simple, routine tasks do not necessarily accommodate moderate restrictions in CPP.  (Doc. 16, at 12) (citing *Varga v. Colvin*, 794 F.3d 809, 814 (7th Cir. 2015) ("The ability to stick with a given task over a sustained period is not the same as the ability to learn how to do tasks of a given complexity."); *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014)).  Plaintiff also argues that limitations to end-of-day quotas are improper because there is no evidence in the record that he could make up for lapses in concentration by working faster at certain times to catch up.  (Doc. 16, at 13) (citing *Novak v. Berryhill*, No. 15 C 50236, 2017 WL 1163733, at *7 (N.D. Ill. Mar. 29, 2017)) (restricting the plaintiff to end-of-day requirements did not accommodate moderate limitations with pace absent any supporting evidence).

In making these arguments, Plaintiff ignores the fact that he has demonstrated an ability to work successfully and meet all the required performance expectations of his job at PetSmart with only the stated restrictions.  Plaintiff's medical condition did not change as of September 28, 2017, so the ALJ reasonably concluded that the same restrictions were sufficient to address Plaintiff's moderate limitations in CPP during the closed period.

For similar reasons, the Court finds no reversible error in the ALJ's determination that Plaintiff could work five days per week, eight hours per day with only normal breaks. (R. 713). Plaintiff claims that since the ALJ asked the VE about off-task time, he should have incorporated that discussion into his analysis. (Doc. 16, at 14) (citing *Gandy v. Berryhill*, No. 2:17-CV-303, 2019 WL 1123509, at *6 (N.D. Ind. Mar. 12, 2019) (where the ALJ asked the VE about off-task time, he erred in failing to explain why he did not incorporate that limitation into the RFC)). Any error the ALJ may have made in this regard is harmless given Plaintiff's proven ability to sustain full-time employment as of September 28, 2017 (with no medical change in his condition) without any concerns about off-task time or excessive absences. Plaintiff's request to reverse or remand the case for further consideration of his CPP is denied.

### 3. Fluctuating Symptoms

Plaintiff claims the case must still be reversed or remanded because the ALJ failed to address the fluctuating nature of his symptoms. As discussed in detail earlier, the ALJ fully addressed all of Plaintiff's symptoms, both positive and negative, and reasonably concluded that he was not as limited as he claimed. *Compare Fuchs v. Astrue*, 873 F. Supp. 2d 959, 971 (N.D. Ill. 2012) (ALJ erred by focusing on treatment notes showing the plaintiff was doing well, and ignoring appointments where he was "still delusional and hallucinating."). Plaintiff stresses his disheveled appearance during exams in February and March 2017 and says he had "periods of brief functionality as well as periods of severe depression, anxiety, and panic." (Doc. 16, at 16). In Plaintiff's view, the ALJ should have found that he was not capable of sustaining employment on his "bad" days. (*Id.*) (citing *Bauer v. Astrue*, 532 F.3d 606, 608-09 (7th Cir. 2008) (plaintiff with bipolar

disorder who was "heavily medicated" was likely to have better days and worse days, and could not hold down a full-time job if she was well enough to work only "half the time.").

Plaintiff once again ignores the fact that he has been able to work full-time since September 28, 2017 despite any fluctuations in his symptoms, and within a week of stating in a function report that he was incapable of working. There is no medical evidence here showing that Plaintiff's symptoms evened out with medication, or that his condition medically improved at any point. And for reasons stated, the ALJ reasonably rejected Plaintiff's testimony regarding his work-preclusive "bad" days. The ALJ's determination that Plaintiff was capable of working during the closed period notwithstanding any fluctuations in his symptoms is supported by substantial evidence.

### 4. VE Testimony

Plaintiff finally argues that the ALJ relied on flawed VE testimony in finding him capable of performing jobs that were available in significant number in the national economy. Where, as here, a claimant cannot perform his previous work, "the Social Security Administration bears the burden of showing that a significant number of other jobs are available to the claimant." *Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020). *See also Liskowitz v. Astrue*, 559 F.3d 736, 742-43 (7th Cir. 2009). "For this step in the analysis, ALJs often rely on vocational experts – 'professionals under contract with SSA to provide impartial testimony in agency proceedings.'" *Id.* VEs "estimate the number of jobs that exist, 'whether vacant or filled, and without regard to the location of the work and a claimant's likelihood of being hired.'" *Id.* (quoting *Chavez v. Berryhill*, 895 F.3d 962, 964 (7th Cir. 2018)). Before accepting a VE's estimate of available jobs, the ALJ must "ensure that the approximation is the product of a reliable method." *Id.* at 821 (quoting

*Chavez*, 895 F.3d at 968).  That is, the method used to estimate job numbers "must be supported with evidence sufficient to provide some modicum of confidence in its reliability."  *Id.* at 822 (quoting *Chavez*, 895 F.3d at 969).

The VE in this case testified that a person with Plaintiff's background and RFC could perform the position of industrial cleaner, the same job Plaintiff was doing successfully at PetSmart as of September 28, 2017.  (R. 766).  In calculating the number of industrial cleaner jobs available to such a person, the VE first indicated that based on a program called OccuBrowse+, there were approximately 1.5 million industrial cleaner positions available nationwide.  (R. 766, 773).  Of those, the VE estimated that approximately 15-20% were nighttime positions considering the job descriptions and her experience working with employers.  (R. 767).  The VE thus agreed that a conservative estimate of the available nighttime industrial cleaner jobs would be 5% of the 1.5 million, or 75,000.  (*Id.*).  Plaintiff's counsel objected to these numbers, arguing that when he looked at a different program, Job Browser Pro, it showed only 11,495 industrial cleaner jobs available nationwide, not 1.5 million.  (R. 773-74).  The VE did not have Job Browser Pro but said she utilized a "two-method validation" to arrive at her figure.  (R. 774).  This involved looking at the Standard Occupational Classification ("SOC") code for the industrial cleaner job, then computing a conservative estimate of available jobs using "the number of jobs reported by the Bureau of Labor Statistics minus the relative standard of error" provided by the Bureau of Labor Statistics ("BLS").  (*Id.*).

At the ALJ's request, the VE submitted a post-hearing report setting forth her calculations in more detail.  The VE explained that she first keyed into the OccuBrowse+ program the SOC code which corresponded to industrial cleaner jobs in the Dictionary of

Occupational Titles ("DOT") (37-2011). (R. 932). This produced 15 occupations totaling 2,164,040 million jobs. The VE then determined that 8 of those jobs (53.33%) constituted medium, unskilled work (as required for a person with Plaintiff's background and RFC), for a total of 1,154,083 positions. (R. 932-33). Next, the VE went to the Bureau of Labor Statistics ("BLS") website, https://www.bls.gov/oes/, and entered SOC code 37-2011. (R. 933). Like the OccuBrowse+ program, the BLS identified approximately 2,164,040 jobs falling in the category of "Janitors and Cleaners except Maids and Housekeeping Workers." Since only 53.33% of those jobs met the criteria of medium, unskilled work, the VE multiplied 2,164,040 jobs by 53.33%, getting a total of 1,154,083 jobs. (*Id.*). Using the BLS's "Relative Standard of Error" of 0.5%, the VE multiplied 1,154,083 by 0.5% to obtain 5,770. She then subtracted 5,770 from 1,154,083 for a final total of 1,148,313 jobs. (*Id.*). The VE rounded this number up to 1.5 million positions "to accommodate fluctuations in employment rate and availability of jobs nationwide," as well as "potential unreported positions nationwide." (*Id.*). Taking 15% of that figure (representing the percentage of available nighttime positions), the VE concluded that there were 172,247 jobs available to Plaintiff in the national economy. (*Id.*).

Plaintiff argues that this methodology is flawed because the VE assumed that all 2,164,040 industrial cleaner jobs were equally distributed across the 15 job titles. This is evidenced by the fact that after eliminating the 7 positions that required too high a skill level, the VE simply multiplied the 2,164,040 figure by 53.33% (purportedly representing the percentage of jobs remaining across the 8 other positions). (R. 932) ("That leaves 15-2-5=8; 8 is 53.33% of 15."). Plaintiff objects that the VE failed to explain how she determined that there were in fact 1,148,313 jobs available across the 8 unskilled

positions, as opposed to some lower number. (Doc. 16, at 18, 19). For example, Plaintiff questions how the VE knew that an eliminated "Janitor" position "did not encompass 50% or more of the total jobs available under the relevant SOC code." (*Id.* at 19).

The Seventh Circuit has criticized the equal distribution method as operating on "the illogical assumption that all job titles within a particular DOT job group exist in equal numbers in the national economy." *Chavez*, 895 F.3d at 966. *See also Alaura v. Colvin*, 797 F.3d 503, 508 (7th Cir. 2015) (the equal distribution approach "assum[es] that each narrow category has the same number of jobs as each other narrow category – which is preposterous."). The court provided the following illustration:

> Consider a VE who determines that a particular claimant is able to perform one of the 24 jobs listed within the DOT under group 313, entitled "Chefs and Cooks, Hotels and Restaurants." U.S. Department of Labor, I Dictionary of Occupational Titles 313 (4th ed. 1991). Under the equal distribution method, the VE would assume that each DOT job title encompassed by the corresponding SOC code exists in equal numbers. But it does not take much knowledge of job markets to know that, while certain jobs may exist in large numbers (for example, a "pizza baker," DOT 313.381-014, who "prepares and bakes pizza pies"), others clearly do not (such as a "chef de froid," DOT 313.281-010, who designs "artistic food arrangements for buffets in formal restaurants" including "mold[ing] butter into artistic forms").

*Id.* The court indicated that "[w]hat most concerns us is that the method rests on an assumption about the relative distribution of jobs within a broader grouping that lacks any empirical footing." *Id.* at 969.

As the Commissioner notes, however, the Seventh Circuit has not precluded VEs from using the equal distribution method. *Id.* at 970 ("Nor is it our place to enjoin use of the equal distribution method."). The court has also made clear that the reliability of job number estimates is not subjected to "an overly exacting standard" and need only be "supported with evidence sufficient to provide some modicum of confidence in its

reliability." *Id.* at 968, 969. The court deemed the estimates in *Chavez* unreliable because the VE utilized two different calculation methods (equal distribution and occupational density) and provided no explanation for favoring one method over the other, instead declaring it "almost logical" that the higher estimate was more accurate. *Id.* at 966, 969. And rather than attesting that the equal distribution method was the more reliable test, the VE merely pointed out perceived shortcomings in the occupational density method, and ultimately admitted that he was "not sure that either one of the methods give a very accurate count on numbers." *Id.* at 969. *See also Brace*, 970 F.3d at 822 (remand necessary where the VE's explanation of the method he used to calculate job number estimates was "entirely unilluminating," consisting of "unelaborated words and phrases such as 'weighting,' and 'allocation' and 'my information that I have.'").

Unlike in *Chavez*, the VE in this case provided a detailed explanation for her job number estimates, which she laid out in a post-hearing report. When Plaintiff's counsel asked about the comparatively lower job numbers he had obtained using Job Browser Pro, the VE stood by her calculations because she had computed them by hand using data from March 2018 she knew to be current. (R. 774). The VE also explained that her estimate of the number of cleaner jobs that can be performed at night was based on "the job description and my experience having worked with employers." (R. 767). Viewing the record as a whole, the ALJ reasonably accepted the VE's job estimates for the "generic job the claimant was performing as a commercial cleaner." (R. 721). *See Chavez*, 895 F.3d at 966 (noting that "it does not take much knowledge of job markets to know that . . . certain jobs may exist in large numbers.").

## CONCLUSION

For reasons stated above, Plaintiff's request to reverse the ALJ's decision is denied, and the Commissioner's Motion for Summary Judgment [23] is granted. The Clerk is directed to enter judgment in favor of the Commissioner.

ENTER:

Dated: November 25, 2020

_____
SHEILA FINNEGAN
United States Magistrate Judge